No. 4119

Second Circuit

HOLCOMB v. PERRY

(January 14, 1932. Opinion and Decree.)
(February 16, 1932. Rehearing Refused.)

Goff & Goff, of Arcadia, attorneys for plaintiff, appellant.

J. Rush Wimberly, of Arcadia, attorney for defendant, appellee.

McGREGOR, J. This is a suit for damages growing out of a rear-end collision between plaintiff's automobile and a truck and trailer partially loaded with logs. On the night of January 4, 1930, about an hour after sunset the plaintiff was driving a Ford touring car on the Minden-Ringgold highway; traveling south on his way to Ringgold. Traveling just ahead of him, a distance of about fifty yards, one Archie Jones was driving a tudor Ford sedan. When about two miles north of the town of Ringgold, plaintiff and Archie Jones came suddenly upon a truck and trailer partially loaded with long slender poles with tapering ends, headed south and parked practically in the middle of the road, without any light or other warning sign displayed either in front or at the rear of the truck or trailer or at the ends of the protruding poles. The outfit was owned by the defendant, Tom Perry, and was being used to haul long slender poles or piling about thirty or thirty-five feet in length. After these poles were loaded upon the truck and trailer they extended from six to ten feet over and beyond the rear end of the trailer. When plaintiff and Archie Jones came thus suddenly and unexpectedly upon the partially loaded truck and trailer it was in charge of Elzey Peavy, an employee of the defendant. In addition to Peavy, there was a negro man named M. B. Clay and another white man named Holman, employed by the defendant, and the three men composed the crew in charge of hauling the poles.

The evidence does not make it clear, but we gather from it that Peavy and his two helpers had loaded the truck and trailer with poles out in the woods some distance from the highway and that on account of a mud hole they had to unload poles in order to get the truck and trailer over the place; that a few of the poles were then loaded and the truck and trailer, thus partially loaded, were driven upon the highway and parked with the idea of dragging the rest of the load by team to the side of the road opposite where the truck and trailer were parked for the purpose of completing the load. The method of loading was as follows: Two or more skid poles were placed each with one end on the truck or trailer and the other on the ground. The poles were dragged to a position parallel and even with the truck and trailer; cross-haul chains were then attached to the poles one at a time and, by means of a team of horses or mules on the opposite side of the road, were pulled upon the truck and put in place, so that, necessarily, while a pole was being loaded, traffic was completely blocked in each direction by the skid poles on the right or west side and by the team and chains on the left or east side.

Plaintiff and Archie Jones were each on his way to Ringgold to attend a show given by Paul English Players at the school house in Ringgold that night. They were friends and neighbors and were using their separate cars for the reason that each one had an engagement with a young lady for the entertainment. Archie Jones' car was not working well and, to use his own words, he asked the plaintiff to trail behind him on the way into Ringgold so that if the car "played out" he could "go on to town" with the plaintiff. With this arrangement and understanding they traveled along at a rate of twenty-five or thirty miles per hour and at a distance of about forty or forty-five yards apart. An effort is made by the defense to show that the rate of speed was greater and the distance apart less, but we think the evidence satisfactorily establishes the above figures as correct.

Archie Jones, of course, reached the truck first. He turned to the right and tried to go around it that way. He struck the skid poles, knocked them quite a distance, ran off the embankment to the level of the surrounding field and finally righted himself and got his car back upon the highway in front of the truck without much injury to himself or his car. If plaintiff had followed the same course he might have come through equally as well. He was following the Jones car, but when he got within twenty-five or thirty feet of the ends of the poles he observed them, and his best judgment dictated that, in order to pass, he should turn to the left as is the custom when overtaking a vehicle going in the same direction. In attempting to go around the left plaintiff was unsuccessful; the ends of the poles caught the body of his car and practically demolished it, though the chassis escaped without much injury. Plaintiff, of course, was very badly shaken up, but he was fortunate in not being instantly killed. He succeeded in stopping the car as it reached about the front of the truck. Plaintiff was able to drive his car with the wrecked body into Ringgold, and after putting it in a garage for repair, he went on to the show and met his young lady friend who, on account of the delay, had gone without him. After the show he returned to his father's home in Archie Jones' car.

Plaintiff states that he suffered some pain on the night of the accident and told his father and mother about it. No physician was called at once, as he hoped the trouble would adjust itself and disappear. Prior to the accident plaintiff had lived with his father on the farm and had done general farm work. During the winter season he assisted his father in making, loading, hauling and unloading railroad cross-ties. Just prior to the time of the accident this is the kind of work he was engaged in. He was a strong, healthy young man about 22 years of age. He loaded and unloaded the cross-ties alone and lifted them without assistance. Ever after the accident he had to have assistance in loading and unloading ties. He could not handle them as he had formerly done. Finally his condition became so serious he consulted Dr. J. N. Blume, a physician living at Arcadia. The doctor diagnosed his trouble as inguinal hernia, and advised an immediate operation. In accordance with this advice and accompanied by Dr. Blume, the plaintiff went to the Tri-State Sanitarium in Shreveport, and on March 3, 1930, was successfully operated on by Dr. J. C. Willis. Eleven days after the operation he returned to his home and on April 11th, this suit was filed.

In his petition plaintiff alleges that defendant's partially loaded truck and trailer were parked in or near the center of the highway in the nighttime, without any light or other warning sign on any portion of the truck, trailer or poles, and that it was this negligence that was the proximate cause of the accident in which he received the injury. In his suit plaintiff claims the sum of $2,548, itemized as follows:

| | |
|---|---:|
| Amount paid Dr. J. N. Blume.............$ | 20 |
| Amount paid Drs. Willis-Knighton Clinic for an operation........................ | 75 |
| Amount paid Tri-State Sanitarium for services and room....................... ........... | 58 |
| Amount paid for expense in going to hospital for father and himself........ | 20 |
| Amount paid for expenses of mother for 11 days while attending and nursing him at hospital......................... | 25 |
| For pain and suffering................................ | 1000 |
| For 4 months' loss of time from work | 200 |
| For permanent injury to ability to do manual labor ............................................. | 1000 |
| For expenses repairing automobile..... | 150 |
| Total ....................................................... ...........$ | 2548 |

In his answer defendant denied that his employees were guilty of any negligence, and in the alternative pleaded contributory negligence on the part of the plaintiff, and as a further defense denied that plaintiff's physical injury was caused by the accident, but that he had been suffering with the same trouble for several years prior thereto.

Trial was had on January 19, 1931, and on March 27, 1931, there was judgment in favor of the defendant rejecting the demands of plaintiff. From that judgment the plaintiff has appealed.

## OPINION

In considering and determining this case there are three questions that arise, viz.:

(1) Was the defendant, or his agents and employees, guilty of negligence?

(2) If so, was the plaintiff guilty of contributory negligence?

(3) Was the plaintiff's hernia caused by the accident, and if not, was it so aggravated and accentuated by the accident as to make the defendant liable in case it should be held that defendant's negligence was the proximate cause of the accident?

The Minden-Ringgold highway is a graveled state road about twenty-eight feet wide and runs north and south. Eight witnesses, including the plaintiff, testified that on the occasion of the collision involved in this case the defendant's truck and trailer were parked practically in the center of this highway, about an hour after dark, with no lights of any kind anywhere about the truck, the trailer or the poles and that the poles extended over and beyond the rear end of the trailer some six to fifteen feet. There was no cab on the truck so that there was no vertical surface anywhere about it on which a headlight of an approaching automobile could shine and be reflected. It needs no discussion or argument to hold that those in charge of this truck and trailer were grossly negligent in placing such an obstruction in the middle of a public highway. As was said in the case of Futch v. Addison et al., 12 La. App. 535, 126 So. 590, 591:

"Leaving on the highway unguarded and without lights such a dangerous menace to everybody using the road after dark, was in violation of Act No. 296 of 1928, Section 39. It was also such an act of inexcusable negligence that defendant's liability on account of having left it there is too plain for argument."

The defendant's employees, for whose negligence he is liable, were even more negligent than it would first appear. Not only were the truck and trailer parked in the center of the road, but when they were in the act of loading the poles, which were dragged to the side of the road for that purpose the road was completely blocked. On the west side were placed skid poles with one end on the truck or trailer and the other on the edge of the road. On the east side was the team of mules and the driver operating the cross-haul chain with which the loading was done. Two witnesses testified that they passed along there just before dark in their car and the team and chain had to be disconnected so that they could pass by. The only conclusion that can be reached is that the defendant is chargeable with the grossest negligence.

The next question to be determined is as to whether the plaintiff was guilty of negligence that resulted in or contributed to the accident out of which his injury is

alleged to have arisen. Some time after dark the plaintiff left his father's home, driving his Ford automobile, intending to go to a show in Ringgold, a few miles south. On his way he stopped by the home of a friend, Archie Jones, who was planning to go to the same show in his Ford automobile. Each of the young men got in his own car and started for Ringgold. Jones' car had engine trouble and he was fearful that it might not make the trip, so it was agreed that he should drive ahead and that the plaintiff should trail him in order that he might assist him if his car should go dead. It is satisfactorily proved by the evidence that the two young men were traveling at a rate of speed not to exceed twenty-five or thirty miles per hour, and that they maintained an average distance of forty or fifty yards apart. Both cars had headlights burning and were being driven with due caution. There was nothing about the truck and trailer parked in the middle of the highway with a few slender poles on them to attract the attention of the most careful driver at night. A headlight of an automobile would not disclose these poles. At best, they would likely appear and show up as lines or streaks on pavement, and on a gravel road they either would be invisible or would appear as ridges or grooves in the gravel until one should come very close to them. Archie Jones, who was ahead in his car, was within a few feet of them before he observed them. He suddenly realized that some obstruction was in the middle of the road. He must have been traveling well to the right of the road, for in the fraction of a second in which he had to act he undertook to pass to the right of the truck and poles instead of to the left as custom and the law would dictate. By using his first and best judgment he turned to the right. In doing so he ran into the skid poles and knocked them twenty-five or thirty feet, while his car, which he kept under control, ran off the sloping edge of the road and then came back upon the highway and stopped in front of the truck. In the meantime plaintiff, following close upon Jones' car, discovered the poles on the truck just a few feet, twenty or thirty, ahead of him, too late to apply his brakes and come to a complete stop. Instead of turning to the right as Archie Jones had done, he turned as quickly as possible and as far as safety would permit to the left in an effort to pass the truck and its load. In this he was not successful. The ends of the poles caught his car on the right side and completely demolished the body without injuring the chassis to any extent. He stayed in the car and brought it to a standstill by the time it reached a point about opposite the front of the truck. In the confusion he evidently was jarred and thrown about considerably in his car as he held on and to the seat and steering wheel. We find nothing whatever negligent in any of his acts. He was confronted with a sudden emergency and exercised the best judgment possible. He was traveling at a reasonable rate of speed, his headlights were in good condition and burning, he was keeping a safe distance behind Archie Jones, he discovered the poles on the truck as soon as could be expected and did all he could to save himself and to avert the accident.

Defendant, of course, invokes and relies upon the doctrine that it is the duty of the driver of an automobile at night to maintain a speed sufficiently slow and to have such control of his car that he can stop within the distance in which he can plainly see an obstruction or danger ahead. In the case of Jacobs v. Jacobs, 141 La. 272,

74 So. 992, 996, L. R. A. 1917F, 253, Chief Justice O'Niell held that this rule is subject to certain modifications, and said:

"It cannot apply to a case where an object or obstruction which the driver of an automobile has no reason to expect appears suddenly immediately in front of his automobile."

In the present case plaintiff had no reason to expect an obstacle in the middle of the road unguarded, such as suddenly appeared immediately in front of him. Furthermore, these long slender poles, on account of their nature and general appearance, could not be easily discerned in the dark at night, no more so than could a rope or wire suspended above the road.

In the case of Futch v. Addison, 12 La. App. 535, 126 So. 590, referred to above, the defendant left a truck and trailer loaded with logs parked on the public highway at night without lights, and it was held that plaintiff was guilty of no negligence in running into it. In the case of Hanno v. Motor Freight Lines, 17 La. App. 62, 134 So. 317, 319, plaintiff was traveling east on the Baton Rouge-Hammond highway; there was another automobile approaching him from the opposite direction, whose driver failed to dim his lights; he pulled over to the right to give the oncoming car the proper amount of road for them to meet, and in doing so he ran into a parked truck of the defendant which had no signal or warning whatsoever of its presence on the road. The defendant was found negligent, and, in reaching its conclusion that the plaintiff was not negligent, the court said:

"Counsel for defendant relies principally on that rule which he takes from certain cases, a good many of them being from other states, to the effect that it is the duty of the driver of an automobile at night to keep his car under such control so that, in case he meets another car and is blinded by its lights, he can bring his car to a complete stop within the distance on the road illuminated by his own lights. We find that to be a correct statement of what the rule is in the cases cited, but we are of the opinion that its application depends entirely on the facts and circumstances arising in each case. In the latest case referred to by counsel, Woodley & Collins v. Schusters' Wholesale Produce Co., Inc., 170 La. 527, 128 So. 469, 470, the Supreme Court of this state holds that it is not an inflexible rule. We quote the following: 'Whether it should be deemed negligence for the driver of an automobile to fail to slow down, in a case like this, depends so much upon the circumstances of the particular case that it is not easy nor safe to lay down a hard and fast rule on the subject.' * * *

"We are of the opinion that a person who is blinded by the lights of a car coming from an opposite direction is called on to exercise great caution and have his car under such control as to safely meet any ordinary emergency which may present itself on the road, because of the darkness, but we are not prepared to hold that he is expected to be able to stop his car, almost on the spur of the moment, when, as in this case, he finds himself confronted suddenly with a situation of extreme peril on the highway such as had been created by this defendant. The situation of emergency was not an ordinary one, as persons are not permitted to leave unguarded, and without lights, trucks or vehicles parked on the public highway after dark. There is another rule of law, equally as well recognized as the one contended for by counsel for defendant in this case, to the effect that the driver of an automobile, confronted with imminent danger to his life or bodily harm, will not be held liable for the results of a collision, even though he did not exercise the best judgment, considering the situation in which he had been placed by the inexcusable negligence of the defendant. This last rule was applied in Stafford v. Nelson Bros., 15 La. App. 51, 130 So. 234, a case where the facts were very much similar to those presented here.

"Looking for what was the proximate

cause of the accident, as we must in order to fix liability, we certainly believe that it was the absence of lights or of any warning whatever of the presence of this large truck at night on the public highway. The state statute, No. 296 of 1928, sec. 57, required that the one in charge of that truck display on it 'one or more lamps projecting a white light visible under normal atmospheric conditions from a distance of 500 feet to the front,' and also a red light 'visible under like conditions from a distance of 500 feet to the rear.' This is not a rigid regulation, and it is a very precautionary one. Had it been complied with in this case, there is little reason to believe that this accident would have occurred."

So in the present case we hold that the proximate cause of the accident was the parking of the truck of the defendant in the nighttime in such a manner as to practically block the entire highway, and the absence of lights or any warning whatever on the truck. This action on the part of defendant's employees was a positive menace to the safety of the public. It was not such an obstruction that plaintiff should be required to see it in time to avoid it so as to include him in the rule as it is usually expressed.

In holding the driver of an automobile responsible for not seeing a truck or other object with which he has a collision, the character, appearance and visibility of the object must always be taken into consideration. An automobile parked along the side of a highway presents such a surface for the reflection of light from the headlights of the automobile approaching that the driver is usually bound to see it at such a distance that he can stop his car before reaching it. But in the case of trucks and trailers with no area at all at the rear to reflect the light of the headlights when the truck is loaded with long slender poles or pipe, it is different. It

cannot be expected that the driver of an automobile will see it in time to avoid a collision, and for that reason he will not be held negligent. This general principle is applied in the well considered case of Holloway v. Pure Oil Co., 17 La. App. 584, 135 So. 381.

The defendant relies on the case of Sexton v. Stiles, 15 La. App. 148, 130 So. 821, decided by this court. In that case it was found that the plaintiff was negligent in that he continued to drive his automobile after he was thoroughly incapacitated and in no condition to drive or see what he should see.

Plaintiff's demand for damages may be divided into two parts, viz.: Property damage and personal injury. The defendant takes the position that, even though he may have been negligent and the plaintiff may have been guilty of no contributory negligence, still he is not liable for the personal injury claimed by the plaintiff for the reason that the trouble originated and existed long prior to the accident and was, therefore, not caused by the accident. It is proved conclusively that for two months after the accident plaintiff suffered from an inguinal hernia and he never received any relief from it until he underwent an operation in Shreveport. Dr. Blume, plaintiff's family physician, testified that in his opinion plaintiff's trouble was caused by the accident. He examined him, knew the history of the case, recommended the operation and was present at the Tri-State Sanitarium in Shreveport when it was performed by Dr. J. C. Willis. The plaintiff says he never suffered from hernia in any form before the accident. In this testimony he is corroborated by his father. A strong corroborative circumstance is that before the accident the plaintiff was a strong, healthy young man,

able to do any kind of work. He loaded, handled and unloaded heavy cross-ties without assistance. After the accident he continued working, but could never do the work he formerly did. He needed help always in loading and unloading ties. The fact that he was well and could do the hardest manual labor before the accident and, dating from the accident, he could do no more heavy work but grew steadily worse for two months and then had to be operated on, negatives the idea that he may have had this trouble for several years before.

To offset plaintiff's contention that his trouble started with the accident, defendant introduced some testimony. Will Reeves stated that seven or eight years before the accident when plaintiff was a young boy he ordered a truss for him. Plaintiff and his father both deny this and state that it was for another brother. W. F. Tipton, another witness, testified that some three years or more before the accident he went swimming with the plaintiff and remembered seeing he wore a truss when he was undressed. Both these instances happened too long ago for the memories of the witnesses to be accurate or reliable, especially since the plaintiff and his father both deny that he had this trouble before the accident.

Plaintiff is criticized for not producing Dr. Willis as a witness at the trial. We do not think this criticism is justified. Dr. Blume gave all the medical testimony that was necessary to connect the injury with the accident. It would have been very expensive to bring Dr. Willis to the trial. If defendant knew, or had reason to believe, that this witness would give testimony against the plaintiff it was his duty to produce him. Of course, if he were the only physician that could testify in the case it would have been the duty of the plaintiff to produce his testimony, either in person or by commission. But this was not necessary. Dr. Blume was close by and his testimony was sufficient. We think that the proof is conclusive: (1) That defendant's employees were guilty of gross and inexcusable negligence; (2) that plaintiff was free of negligence; (3) that plaintiff's physical injury and property damage are the direct result of the negligence of defendant's employees, and (4) that defendant is therefore liable.

## QUANTUM OF DAMAGES

In his demand for damages for this accident the plaintiff has been very reasonable. It often happens in personal injury cases that the plaintiffs demand sums greatly in excess of the actual damages caused by the accident in the hope and expectation of securing a judgment for a smaller amount that will approximate the real damage. All the items claimed except those for pain and suffering and permanent disability were definitely proved, and from the evidence we think that these two items are satisfactorily established. Plaintiff's condition was relieved by the operation, but he is nevertheless permanently impaired and will never be able to do the character of work that he used to do. His suffering was bound to have been severe and intense and continued for some months.

For the reasons assigned, the judgment appealed from is annulled, avoided and reversed, and it is now ordered, adjudged, and decreed that there be judgment herein in favor of the plaintiff, Ernest O. Holcomb, against the defendant, Tom Perry, for the sum of $2,548, with 5 per cent interest from April 18, 1931, with all costs of both courts.

DREW, J., concurs.