A motortruck of plaintiff, Boland Machine Manufacturing Co., sustained damage when its operator, after dark on a rainy night, drove it into the ends of large timbers which were extending from the rear of a trailer of J. M. English Truck Lines, which trailer was attached to a motortruck of that concern and which trailer and truck had been left standing on a street in the City of New Orleans several feet from the curb.
The truck and trailer of the J. M. English Truck Lines were within the coverage of a liability insurance policy issued by Highway Insurance Underwriters, a non-resident corporation, and the plaintiff corporation, alleging that the accident resulted solely from negligence of the operator of the truck and trailer and its owners, brought this suit directly against the said insurance corporation under authority of Act 55 of 1930, and prayed for judgment in the sum of $366, alleging that it had been required to pay $306 in repairing the truck and $60 in the renting of another truck while its own was undergoing repairs.
The defendant corporation denied negligence on the part of the operator of the truck or its owners and, in the alternative, averred that the driver of plaintiff's truck was guilty of contributory negligence.
During the trial in the Civil District Court it was admitted that the repairs to the truck had cost $306 and that $26 was spent for the rental of another truck while the repairs were being made.
There was judgment in favor of plaintiff for $332 and defendant has appealed.
The accident occurred at about 6:30 o'clock on the evening of January 30th, 1942 (the record in several places erroneously mentions it as June 30th, 1942), on So. Peters Street between Girod and Lafayette Streets. So. Peters Street is fairly wide. In its center is a street car track and vehicles are permitted to operate in only one direction from uptown towards Canal *Page 309 
Street. It had been raining and the street was wet.
The truck and trailer of the J. M. English Truck Lines were in charge of its employee, Angelo Joseph Benandi, who was admittedly acting within the scope of his employment. The trailer was an adjustable one consisting of two rear wheels connected by an axle and a skeleton body with a long member which connected the rear wheels with the truck and which member could be lengthened or shortened as necessary in accordance with the length of the load to be transported.
There were on the trailer two timbers, estimated by some witnesses as being's long as 60 feet, but which we think in all probability were only 40 feet in length. These were square and were what are known as 12 x 12s. It is not shown whether they were new timbers or old but the record leaves us convinced that they were dark in color, and Benandi, the driver of the truck, said that since they were wet, "they were naturally dark." There were also some steel rods on the truck though neither the number nor size of these rods is given. The timbers extended beyond the rear of the trailer a distance which defendant admits was 8 feet, and which some of the witnesses say was 10 feet or more.
It was the purpose of the driver, Benandi, to make a delivery of either the steel rods or the timbers — the record does not make it clear which — at a place of business known as Murray Baker, which is located on the river side of So. Peters Street. In order to make that delivery it was necessary that the trailer be backed into the establishment and to accomplish this maneuver, which with a trailer is rather difficult, the driver went a short distance beyond the entrance and stopped, preliminary to backing into the entrance. There were other vehicles at the curb so that when he stopped the truck and the trailer they were some distance from the curb and on the outside of these other vehicles.
The record shows that when it was stopped the left side of the trailer was about three feet from the nearest rail of the street car track which was on that street, and that there was a considerable space remaining in the street through which the Boland truck could have passed had its driver noticed that it was necessary for him to swerve to the left.
Benandi left this equipment standing in the street and went into the establishment of Murray Baker to find out whether he could back into the entrance. He says that he was gone only about five minutes and that when he returned, he decided that as he would be required to wait a short time he would string certain lights along the outer edge of the trailer. While the record does not mention the character of these lights, we get the impression that there were three electric lights strung together with wire and that one end of the wire was to be plugged into the electric circuit of the truck. He says that as he was stringing these lights he saw plaintiff's truck turn into So. Peters Street about two blocks away and come towards his stationery trailer, and, feeling that the driver of plaintiff's truck might strike the timbers extended from his truck, he swung the lights back and forth as a warning but that the driver of the on-coming truck apparently did not notice the timbers nor the lights until it was too late, and that the driver of the said Boland truck, swerving to the left at the last moment, crashed into the ends of the timbers. Benandi insists that some time before this he had turned on all of the lights on the truck and trailer, and that these lights consisted of two headlights, three lights on top of the cab of the truck, two "headache" lights situated on the truck just behind the cab, and a taillight on the trailer.
Lawrence Kissinger, the driver of plaintiff's truck, says that as he approached the spot at which the accident occurred he was operating his truck at a speed of 20 miles per hour and that he, too, had to stop at the Murray Baker establishment in order to pick up some fittings; that he noticed the lights on the top of the cab which was in the roadway ahead of him but that he did not know whether these lights were on a standing or on a moving vehicle and that there were no other lights on that truck or trailer, and that he did not notice that extending towards him some 50 or 60 feet from the truck was this trailer loaded with these long timbers. He says that when he did notice the timbers it was too late and that though he attempted to swerve to the left, he could not avoid a crash.
Section 4 of Article X of Ordinance 13702, C.C.S., reads as follows: "Flag or Light at End of Load. Whenever any part of the load on any vehicle shall extend more than four feet beyond the rear of the bed or body thereof, there shall be displayed at the end of such load, in such position as to be clearly visible at all times from the *Page 310 
rear of such vehicle, a red flag not less than twelve (12) inches both in length and width, except that between one-half hour after sunset and one-half hour before sunrise there shall be displayed at the end of such load a red light plainly visible under normal atmospheric conditions at least 200 feet from the rear of such vehicle.
It is conceded that the timbers extended from the rear of the trailer a distance of at least 8 feet and the record shows that on their end there was neither a flag nor a light. In spite of the vehement statements of Benandi, we think that the record by an overwhelming preponderance shows that as Kissinger approached no lights which were visible to him had been lighted on either the truck or the trailer except the three lights on the top of the cab. These lights were at least 50 or 60 feet from the rear ends of the extending timbers.
It is true that three of plaintiff's witnesses say that there were no lights at all on the truck and that to this extent there is a disagreement between them and the other of plaintiff's witnesses. Kissinger, the driver, says that there were lights on top of the truck of the English Company. We think that this is not an important discrepancy. Where witnesses disagree on unimportant details they are more apt to be telling the truth than if they agree on details of insignificant facts.
At this point we think it necessary to say that there is in the record a pencil statement, not written by Kissinger, but signed by him, in which appears the following: "I saw some lights on the street side of the truck and I thought that that was the end of the truck. I later learned that it was the driver of the truck holding the lights on the side of the truck."
This statement is pointed to as being a contradiction of his testimony on the witness stand that he saw no lights other than those on top of the truck. When interrogated concerning this statement, Kissinger said that he had no recollection of having made it. At any rate we think, as we have already said, that the record overwhelmingly shows that there were no other lights than those on top of the cab of the truck.
[1] Although, because of other vehicles and because too of the maneuvers which Benandi was required to make, it may have been necessary that he stop in the street at some distance from the curb as he did; it was certainly apparent to him that grave danger would attend such a stop and it was his duty to do all that he could to make his trailer and the timbers on it visible to approaching drivers. A violation of the City Ordinance under such conditions was negligence and this negligence clearly had causal connection with the subsequent accident. Of that we have no doubt at all, and the only question which gives us any concern is whether Kissinger was, himself, guilty of contributory negligence in driving his truck at too high a rate of speed and in not noticing in time the timbers which were on the trailer which was parked on the street ahead of him.
[2, 3] There is a well-recognized rule that unless the circumstances are most unusual, it is negligence to operate a motor vehicle at a speed which will not permit of its being stopped within the distance which is illuminated by its own headlights. It is recognized generally that even if the obstruction or the other vehicle in the road ahead is not lighted, it is ordinarily considered negligence for a driver to so operate his vehicle that he cannot avoid striking the obstruction or the other vehicle. In Louisiana Power Light Co. v. Saia, 188. La. 358, 177 So. 238, 239, the Supreme Court said:
"Act No. 21 of 1932, § 9, subd. (g) 1, the State Highway Regulatory Act, requires every vehicle operated on the public highways of the state between one-half hour after sunset and one-half hour before sunrise to be equipped with burning headlights of sufficient strength to make clearly discernible any person on the highway for a distance of 200 feet ahead.
"In applying this provision of the statute, the courts have concluded that a motorist is held to have seen an object, which, by the use of ordinary care and prudence, he should have seen in time to avoid running into it, and that the driver of an automobile is guilty of negligence in driving at a rate of speed greater than that in which he could stop within the range of his vision. O'Rourke v. McConaughey, La. App., 157 So. 598-606; Hutchinson v. James Co., La. App., 160 So. 447; Sexton v. Stiles, 15 La. App. 148, 130 So. 821, 828; Blahut v. McCahil, La. App., 163 So. 195; Goodwin v. Theriot, La. App., 165 So. 342; Waters et al. v. Meriwether Transfer Co., 18 La. App. 18, 137 So. 578."
In Raziano v. Trauth, 15 La. App. 650, 131 So. 212, 213, we applied this doctrine and permitted recovery by the owner of a *Page 311 
vehicle who had left it standing on a city street without lights, and which vehicle was run into by another vehicle. We quoted from Parlongue v. Leon, 6 La. App. 18 — " 'It is negligence to stop an automobile upon the highway after dark without headlights or back lights. But this negligence does not justify another automobile to run into it negligently, nor absolve it from responsibility if, by the use of ordinary care, the collision could have been avoided. The question whether the plaintiff had lights in front or the rear of his automobile at the time of the accident is asserted by the plaintiff and denied by the defendant. Assuming that the plaintiff had no lights at all, he can fail to recover only if defendant, in the absence of those lights, could (not) have avoided the collision by the exercise of proper care.' "
That general rule is so well established that no further comment on it is necessary, and, in fact, counsel for plaintiff recognizes it but contends that where there are unusual facts or circumstances which might explain the failure of the driver of the oncoming vehicle to see the stationery one, a different rule must be applied, and that where there are such circumstances the driver of the moving vehicle may be held to be free from negligence. Counsel for defendant maintains that, as a matter of fact, here there were no such unusual circumstances and that, as a matter of law, even if there were they could not be relied on as excusing the failure of Kissinger, plaintiff's driver, to see the timbers and the trailer ahead of him because those unusual facts or circumstances were not alleged by plaintiff in its petition.
[4] In support of the last contention, counsel for defendant calls attention to the fact that in Louisiana Power Light Co. v. Saia, supra, the same contention that there were unusual circumstances was made, and the Supreme Court said that any such circumstances could not be considered because they were not set forth in the pleadings — "It does not appear from the record that the plaintiff at any time offered an amendment to its petition to explain that there were any unusual circumstances which might have puzzled and confused the driver, as a prudent and careful operator, and prevented him from seeing the parked vehicle. * * *"
We think that this does not mean that there must be an allegation using the words "unusual circumstances" or referring expressly to every detail of the facts which are said to constitute such unusual circumstances, and that all that is necessary is that there be alleged facts which, if shown to be true, will constitute the unusual circumstances which would explain the failure of the driver to see.
[5] Here there are allegations that the long timbers were extending beyond the rear of the trailer without lights; and that the night was dark, and there is the further allegation that "under such a situation petitioner's driver did not see these timbers."
Furthermore, the record, without objection, shows that the street was wet. We think that these allegations set forth unusual circumstances.
We next consider whether there is an exception to the general rule stated above, and whether, where there are such unusual circumstances, the failure of the oncoming driver to see may be excused. That there is such an exception is, we think, well settled. In fact, it is recognized in Louisiana Power Light Co. v. Saia, supra, in the language just above quoted. Other cases recognizing this exception are Warnick et al. v. Louisiana Highway Commission, La. App., 4 So.2d 607; Holcomb v. Perry, 19 La. App. 11, 138 So. 692; Holloway v. Pure Oil Co., 17 La. App. 584, 135 So. 381, and many others.
Let us then investigate the circumstances to see whether they were unusual. The night was dark and it had been or was raining, and the street was wet, and, therefore, admittedly "black". The timbers themselves were admittedly dark, and they extended 8 or 10 feet beyond the rear end of the trailer. They were not lighted or otherwise marked, and they were rather low as is evidenced by the fact that the driver of the Boland truck could see the rear of the cab of the truck and the lights on top of it. The trailer consisted of practically nothing except its two rear wheels and the axle, and the member which extended from the middle of the axle to the truck. Kissinger, who admits that he saw the lights on top of the truck, was obviously confused by the fact that he saw those lights and seeing nothing between him and the truck on which those lights were situated, assumed that he could approach to within 30 or 40 feet of the truck, and then turn to the left and go around it. Suddenly he was confronted by the ends of the timbers which were 40 or 50 *Page 312 
feet or more nearer to him than the lights which he could see on top of the truck.
Was Kissinger at fault in the matter of speed? He concedes that he had been opperating his truck at about 25 Miles per hour but he claims that he had reduced his speed to 20 miles per hour before reaching the timbers. Counsel for defendant claims that this speed was excessive. He relies on Article V, paragraph 6 of the Traffic Ordinance of the City of New Orleans, No. 13702, C.C.S. This paragraph reads as follows:
"6. Speed of Trucks.
"Subject to the provisions of Paragraph 3. Restrictions as to Speed, the speed of trucks equipped with solid tires shall be as follows:
Combined Wt. Load and Vehicle — Speed
Less than two Tons — 20 miles an hr. 2 Tons and less than 3 Tons — 15 miles per hr. Three Tons and over — 10 miles an hour.
When a truck is equipped with pneumatic tires, the speed may be increased five miles per hour."
The record shows that the Boland vehicle was a 1 1/2-ton Ford pick-up truck. Therefore, even if its tires were not pneumatic, it could have been operated at a speed of 20 miles per hour unless there were unusual facts which would make such a speed dangerous. If it was equipped with pneumatic tires — and since it was a Ford pick-up truck, we are justified in assuming that it was — it could have been operated at a speed of 25 miles per hour.
[6] Counsel says that the surrounding circumstances made it dangerous to operate a truck in that locality at as high a speed as 20 miles per hour, regardless of the ordinance. The scene of the accident was some distance from Canal Street, though it was in the general business section of the city. It is not shown that there was any tremendous amount of traffic nor did the accident occur at a street corner; so, in spite of the rainy condition of the weather and the darkness of the night, we do not think that 20 miles per hour was excessive. The driver of the English truck, in maintaining that the Boland truck must have been operated at a very high speed, says that it knocked his truck and trailer 20 feet forward. When we consider the fact that the moving vehicle was a small 1 1/2-ton Ford truck and that the stationery vehicles were the very large truck and trailer with two tremendous timbers on them, we think that this statement is obviously absurd. As contradicting that statement we find that Kissinger, the driver of the Boland truck, said that when his car struck the trailer and timbers ahead of him, "I didn't go no where." The fact of the matter is that it was Kissinger's purpose to stop almost at the spot at which the timbers were, so it is inconceivable to us that he was operating his truck at a tremendous speed.
[7] All in all, we find no contributory negligence in the driver of plaintiff's truck. As to the loss sustained by plaintiff, we find that it is agreed that if there should be a judgment in favor of plaintiff, it should be for $332. That is the amount of the judgment. It is correct.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.
WESTERFIELD, J., absent, takes no part.